to the 5th Circuit. We'll call the first case for arguments today, which is United States of America v. Kim Ricard. We'll hear first from Ms. Kuhn. Good morning. May it please the Court. My name is Samantha Kuhn, and I represent Kim Ricard. Now, this appeal raises a number of different issues, obviously, and so, with the Court's permission, I'd like to start by talking about the sufficiency issues that were raised in the briefs, and then move on to the restitution and sentencing errors. This case is unique for a couple of very important reasons. First of all, it's just a kickback case. There's no Medicare fraud involved in this case, which is a common thread among a lot of the cases that were cited in the briefing. These two things often go hand-in-hand. This case was just about financial incentives and kickbacks. It's also unique because it involved not only a lack of evidence showing that Ms. Ricard knew and intended to be doing something unlawful when she was receiving commissions, but there's affirmative evidence in the record showing that she believed that her conduct was completely lawful and not improper and actually the norm for the industry. Three things are clear from the record in this case. First, throughout the time that she was working for Progressive, Ms. Ricard never hid the nature of her compensation, and she freely spoke about how she was being paid by Progressive. Second, the people she actually worked with also seemed to think that they, that this was a completely normal payment structure. Mr. Diaz, Ms. Cornell, and Ms. Hopkins all testified that they believed that paying commissions for patient referrals to marketers was proper at the time. It was clearly a powerful jury question, but the jury was instructed that it had to find willfulness. The instruction is a clean one and good. Then cross-examination, as you're just saying, of Cornell and Hopkins elicited that they didn't think it was unlawful. Right. Then in closing argument, trial counsel was able to say there's no rue here, remember? And emphatically saying to the jury, the government didn't look into her computers, didn't show that she'd ever even looked at the regs. So the whole issue of scienter, state of mind, was squarely presented to the jury. I think the big problem here, and I think this actually kind of bleeds into some of the arguments that were raised on appeal regarding the deliberate ignorance instruction and the testimony from Lisa Cornell. But that's a plain error view, right? I don't believe deliberate ignorance is a plain error view. I believe that it was preserved by defense counsel when they raised their objection. And I believe that the inferences that had to be found specifically by the court in order to give that. So in the jury charge, I may be wrong, Ricard objected to the deliberate difference instruction? There was an objection to the inclusion of the deliberate ignorance instruction. And so I believe that that error, along with the introduction of Lisa Cornell's testimony, which was improper 404B evidence, helped color a picture for the jury that was improper and allowed them to lower that bar for willfulness. So it's an aggregate argument. It's not just sufficiency. It's the 404B plus the deliberate indifference plus the thin, close call on evidence. I don't believe it's necessarily an aggregate. I think that the sufficiency argument stands alone, that there was a lack of evidence of knowledge and willfulness. But I think in considering, okay, well, how did all of these jurors then come to this conclusion? You know, how are we supposed to find that no rational juror could have found this beyond a reasonable doubt? I think those evidentiary errors and the jury instruction error is what allowed that to happen. I think that kind of explains why that result came the way it did. As to the 404B, a limiting instruction was given as to proper use of 404B, or do you contend it wasn't? There was a limiting instruction provided, right. But I think that, nevertheless, the information that came through there, and, you know, this is some of the information I highlighted in the brief about Joe Haynes and about other players and just generally about Ms. Ricard's, you know, professionalism and that kind of testimony, it was all extremely prejudicial. It made it seem, you know, it basically painted her in a very poor light, which was not related to actually any knowledge or willfulness as far as receiving commissions for patient referrals or any knowledge that that was something unlawful. Go ahead and make your argument. So I guess regarding the evidence that Ms. Ricard was just completely open during the time she was at Progressive about her payment structure, we obviously have the fact that she, that every single witness that worked with her testified that she brought the idea of per patient referrals to them or she just openly told them. Ms. Hopkins, who she worked with since 2006, said she openly talked about getting paid per patient. Mr. Diaz and Ms. Cornell both testified that she came to them and asked them to be paid per patient. And when Ms. Cornell said that she wouldn't, she was actually shocked that that was the response she got. She also, or Ms. Cornell testified that Ms. Ricard told her other agencies had paid her that way, and she was being paid in check form, not cash form. She even declared Progressive as her employer on a loan application. So all of this evidence actually shows that she was not trying to hide anything and she was not trying to be covert. But the jury did also hear that then she denied it to the agent. Now, you may say, well, there wasn't corroboration, he didn't take notes, he didn't record it, but that all goes to the weight of their verdict as to her later denying when federal officers inquire. Right. I think with regard to the false statement allegations, I mean, obviously for the reasons that were talked about in the brief, our position is that the evidence that there was even a false statement made was very tenuous and that conviction shouldn't stand. But even setting that aside, even if we assume that she intentionally lied at this interview, it was over two years later after the fact, it was after numerous people had been indicted on kickback charges, and it was in this context where it can't possibly show evidence of willfulness at the time. It would be different in some of the cases that were cited to show, okay, well, testimony about or evidence of lying to agents can be evidence of a guilty conscience. Did you make any argument that the statement should have been corroborated in some way in order for it to be admissible for the purposes of conviction? I don't think it was inadmissible for the purposes of conviction. But did you make an objection or argument to that effect? I don't believe that there – I don't recall, actually, if at trial there was an objection to its actual admission. In this case, if we were inclined to say that such a charge should be corroborated in order to sustain its criminality, there would be no basis for us to reach that conclusion other than just to pull it out ourselves and say it. I mean, there would be no – you've laid no groundwork for our making that holding. I think that the ruling that we would be looking for, it wouldn't be as broad as, you know, without evidence of corroboration this can't be sufficient on its own. I think the problem here is that the testimony itself and the evidence itself, a, there was a problem about his actual recollection and there was, you know, a lack of recollection as to when the report was even written. So this is just uncertainties built upon each other. I'm asking procedurally in terms of the way the case was tried, the objections that were made, and the way the case has been briefed, is there a basis for us to reach out and make a determination that corroboration is required in this circumstance? I think that would be appropriate in order to meet the mens rea requirement and the elements of that false statement. So, yes, taking it back a little bit to the sufficiency for the knowledge of the kickbacks, I mean, that's where those false statements come tied in. But if this had been a false statement where she had said, oh, yes, I was receiving patient commissions at Progressive and I knew it was unlawful, which is actually the case in a lot of the cases that were cited in the briefing, that would be one thing. But here she didn't speak about her knowledge at the time of her work at Progressive. She didn't say anything to suggest what her mental state was at that time. And so to say that two years later when she makes a general denial of something that happened two years prior and when she even makes equivocal statements saying she doesn't quite remember what her payment structure was, that can't possibly be sufficient on its own, especially in light of all the affirmative evidence that she never hit her structure while she was at Progressive. So that's why that false statement should not be considered to be sufficient. And I see that, you know, I've used about half of my time. So with the Court's permission, I'd like to move on to restitution. I just have one other question because you make a powerful argument in your brief that these convictions generally apply to professionals and management structure, and therefore they have more knowledge. The Najoku case, was the co-defendant Terry Porter in a similar situation to your client? So the interesting thing about that case is that the Court, and I believe Judge Dennis was on this opinion, the Court actually hinged its determination and its holding on the fact that Porter had received advanced training on confidentiality while working at the hospital. Porter was responsible for the billings for the university, and so that included Medicare buildings for the associated hospital. And so as part of that responsibility and as part of the fact that there was not the position because she was an administrative assistant. Right. You're saying it has to have the individual has to have had some training. Is that the position you're arguing? Right. That would be my position that her lack of training is evidence that she had no knowledge. I mean, I think that's the distinguishing feature there is that there was evidence both of access to data and to the training. So I guess shifting over to restitution and sentencing, I think that here it is a clear case that the district court didn't apply the correct calculations to either the restitution calculation or the sentencing guidelines. With respect to sentencing, the guidelines we're looking at are this improper benefit conferred enhancement. And the case law is clear that proving enhancements is the burden of the government. They are the responsible ones for bringing forward the evidence to show that an enhancement is justified. And it's the court's responsibility to ensure that the guidelines are calculated properly. And the government, again, has to provide them evidence to do that. Here the court was required to apply this net value calculation, and the government had to give them evidence to do so, and they didn't. They only provided evidence of a portion of the analysis, this estimate of money that Medicare paid to progressive. And so for that reason, there was not a prominence of the evidence to show that the sentencing enhancements were justified, and the court should have held the government to its burden and denied the enhancement because they failed to prove it up. The government does talk about burden shifting, and just briefly I'll say that the case law doesn't support So your position on improper benefit is there should have been an offset deduction, vacate remand for that. But your position on restitution is there is no loss at all. Right. And the best case for that is? The best case for the restitution being no loss is probably Mahmoud. I would say Mahmoud is the best case because in that case, they actually looked at the services that were provided, and that was actually a fraud case where there was evidence of up-coding and up-billing and that Medicare was paying out more than they were supposed to pay. And even in that case, the court looked at it and said, just because some of these charges were fraudulent and, you know, were not losses to Medicare, doesn't mean all of them were. And the court remanded and required a recalculation of that restitution. And that's a case involving actual fraud where there's evidence that there's illegitimacy and services aren't being provided or Medicare is being overcharged. Here there was no evidence and there was no factual findings that there was any kind of illegitimate service, that Progressive was, you know, up-coding bills or billing for services that weren't provided or doing anything to defraud Medicare. And so that's why the position is that there really was no evidence in the record that any restitution should have been ordered. The government contends we only review for plain error here. I guess when you look at the sentencing, you didn't yourself say here's the offset amount, this is what would be the net. What you did was say we shouldn't be responsible for 1.9. Are you speaking about restitution or guidelines? I guess I'm thinking more improper benefit. Okay. For improper benefit, again, you know, the problem here is that, and counsel objected and said, look, there's no evidence that this was the amount of money that went to Progressive. And so there was an objection to this calculation generally. And it's a calculation that wasn't brought up until after all the trial evidence had been produced and the PSR was submitted. But counsel brought that up at the sentencing hearing, and the court basically just accepted this estimate of Medicare. Now, the government has said, well, you know, then it was your burden to come back with us with direct costs. But in those cases that are cited that talk about, okay, well, you know, the defense needs to come up and tell us why something else needs to be deducted, those always start from a baseline where there is a net value calculation. The government has already said, here's what we believe the benefit was that went to this company. And then it's the defense that says, well, what about the bonuses that were paid out? Those should be direct costs. This is a different scenario because there was no analysis. And, in fact, the government has the financial records and had them to be able to do that analysis. They were working with Mickey Diaz. They had the financial records of Progressive. It was within their power to make that calculation and provide that evidence. And the district court didn't hold them to that burden. Remind me, did the PSR say 2B4.1 commentary requires net, and we say net equals 1.9? I don't recall. I can check that during the government's argument. Did you object to the PSR? An objection was filed to the calculation as 1.9. And yet it restated 1.9. Right. And it basically just said, at one point it said the government, well, in the PSR, the final one said Medicare hasn't provided us an affidavit of losses, and it just said the government has informed us that this is the loss amount. And then separately it— The loss amount doesn't equal improper benefit. Right. But then for the guidelines, it similarly just kind of had a blanket statement that said this is the calculation of the improper benefit. And it didn't provide, I think somewhere in the offense conduct, it explained the calculation the government had done, but it didn't provide an independent calculation verifying that that was the proper calculation of that benefit. And I believe that my time is up, so if you have any more questions, I'm happy to answer them. Thank you. Thank you. Mr. Sanders, whenever you're ready. May it please the Court. Jeremy Sanders on behalf of the United States. Your Honors, the Defendant Kim Ricard was convicted by a jury on eight separate counts for her role in a scheme whereby she referred Medicare beneficiaries to a home health agency in exchange for kickbacks, and then when her demands to increase her per patient referral fee were not met, the Defendant arranged to have the patients discharged and moved to another home health care agency without regard for their medical health. Trust me on the charge, the violation, the code reflecting the kickbacks. Are you charging that as fraud? No. No, the government did not bring Medicare fraud charges here. What is that charge? I mean, kickback is made unlawful by regulation, not by statute. Actually, no, Your Honor. There is a federal statute, 42 U.S.C. section 32. Okay, so that is the basis. In other words, that's the basis they were charging. It's that federal statute that specifically relates to kickbacks. Yes, Your Honor. It's the anti-kickback statute, and it outlaws both soliciting and receiving as well as paying and offering remunerations for federal health care. So count one was a conspiracy to violate 42 U.S.C. 1320A and then the three substantive counts that Ms. Ricard was charged with. So this prosecution doesn't rest on the regulation of Medicare regulation relating to kickbacks at all? That's correct. It's actually within the federal statute, yes. And I'll note that that federal statute contains a provision itself that specifically says with respect to willfulness charge that the defendant doesn't actually have to know of the existence of the anti-kickback statute or know that that was the statute that she was violating, rather just consistent with the general willfulness instruction that was given in this case, just that her conduct was in some way unlawful and that she acted to disregard it. So this particular defendant could have done whatever she did and is charged with as an employee working on a salary and have done the same thing. Is that more or less true? Not necessarily, no, Your Honor. So this circuit applies the one-purpose rule for kickbacks, which is that if any purpose, if any part of the remuneration is to refer patients, it is unlawful. There is a safe harbor provision under the anti-kickback statute which allows for certain lawful arrangements to be made. They require sort of very specific, you know, requirements, and it is an affirmative defense, which the defendant did not raise here at trial. In effect, she was soliciting business for the home care agency. The testimony from Mr. Diaz, who owned the home health care agency, was that she approached him with the ability to refer patients to him. She was marketing for him. She was herding patients in to him. But you can hire people to go out and solicit patients and to advertise and to try to get patients in as long as you're on the salary. Is that right? You can certainly, the home health care agencies as well as other medical companies can have marketers, which can do community marketing events and things like that, if they're salaried. But in any instance, if any portion of what they are paid is to procure a patient referral for a federally health-funded program, that is unlawful under the anti-kickback statute. So the person, an employee, who went to one of these fetal hospitals that were feeding into the home care agency would be prohibited. It would be prohibited if they were being referred, if their payments were on a referral basis, yes. But only if their payments were on a referral basis. They could go to the president of the feeding hospital and say, look, we would appreciate your sending your business to us. We do a good job. This is what we do. And take him out to lunch and solicit him as you would solicit any kind of a client, and he starts referring business to you because of the personal relationship that you've established with him by marketing techniques, then that would be perfectly legal. Correct. Under those circumstances, unless there was other evidence of fraud or anything like that, that would be a legitimate marketer. What's the difference? What is the difference if she were referring it without fraud? In other words, if she was... There is no requirement to violate, and I will agree with my opponent, that this was not charged as a fraud case. Right. This was charged as a violation of the anti-kickback statute. What happened here was far different from the circumstances you described, Judge Jolly. It's a pretty thin line sometimes. I mean, it seems to me, I mean, they're both trying to herd people into the home care agency. I would dispute the evidence at trial was not that Ms. Ricard, you know, solicited or marketed the home health care agency services to doctors or people who could prescribe. She simply obtained the Medicare beneficiary information from the administrator of Seaside Behavioral Center, who, in fact, what the evidence at trial showed, she had a romantic relationship with, and simply moved that paperwork back and forth. She never did in the testimony of Mr. Diaz, as well as testimony of Ms. Cronall, where she also worked as a... I don't disagree. I'm talking more or less in the abstract, obviously, about the difference between paid per individual as opposed to being paid generally. Well, certainly, but I would have to understand what sort of rubric that complaint about an anti-kickback statute versus traditional lawful marketing would be, and I think that would go down into what is being litigated here by colleagues on the other side, which is whether there was evidence that the government introduced to prove that she acted knowingly and willfully, and we think there was more than sufficient evidence for the jury to infer that from the circumstances of this case, namely the inherently suspicious nature of the scheme. I agree. There's a lot of evidence. Sure, certainly. Also, as it's... The jury had a question on willfulness, didn't they? I'm — I don't recall from the record if they did. It's very possible that they did. It seems like the willfulness argument does dovetail with deliberate indifference. They had — Ms. Ricard had no defense witnesses, right? That's correct. But it's clear in opening statement from defense counsel that lack of knowledge was going to be forcefully presented. So the question then for you to support the instruction is, what's the best record site to evidence where she contrived to avoid learning? And it will help me if you point to something that isn't 404B evidence. Okay. So, first, if I could just correct a statement that was made earlier. I would disagree that the deliberate ignorance instruction is preserved for appeal. I think it is reviewable for plain error. I believe in the reply brief the appellants all but concede that fact. When the challenge was made to the deliberate indifference instruction before the district court, it was made solely on the basis that it was duplicative of another instruction, which was namely the... The answer. Essentially. It could be inferred from the other surroundings. There was no discussion about the fact that the defense may not have put the issue at trial, which they certainly did. There was no discussion about that. There wasn't enough evidence at trial to sustain or to warrant the instruction. But as to your specific request, Your Honor, I think the best evidence, and I understand that your request is to not relay on 404B evidence, I do think the best evidence was what she didn't do with regard to her participation at Abide Healthcare, which was attend any of the marketing services or anything like that. Aside from that, however, the — this Court has held that the second prong of the test, which is any purposeful contrivance to avoid learning of it, can be established when the, quote, circumstances were so overwhelmingly suspicious that a defendant's failure to conduct further inquiry suggests a conscious effort to avoid incriminating knowledge. And similarly, suspicious behavior is sufficient to infer subjective awareness of the conduct. And we've outlined the inherently suspicious nature of this. The demands for higher payment or the patients would be pulled. The fact that they shopped them from multiple home healthcare agencies. The fact that there was evidence that Mickey Diaz was paying bribes to the doctors to prescribe the falsification. He has pled and testified? I'm sorry? He did, yes. What about the Seaside Doctors? The Seaside Doctors have subsequently been charged. I believe that — They weren't part of the trial. They were not part of the trial. They certainly heard nothing about — They did not hear from them, but they certainly heard about them and the fact that Mickey Diaz paid both of them. And that was at the request of Kim Ricard and Joe Haines. And finally, the nature of the discharge in this case, to have all these patients discharged at the same time, inherently suspicious because the testimony at trial would be people normally recover at different weights. You wouldn't normally see something like that. So on the deliberate ignorance, I would also want to note out, which we talked about earlier, that there was a lie to the investigator in this case, and that can also show guilty knowledge. So I think were it preserved for appeal, which I don't think it is, this was an adequate case in which the government thought it was appropriate given that it was her central defense at trial, highlighted through her opening into all her cross-examination questions and as well as her closing. So I think it was the appropriate case to give it here. And even if it were improper, we believe that it was harmless because of the evidence of actual knowledge as well. I'll move on to some of the questions that came up with regard to the sentencing. Before you do that, you cite Sosa as a strong case to support willfulness. In that case, did the defendant admit that the defendant knew the payments were illegal? I think I'm trying to remember. There is where the Eleventh Circuit that simply said that it's one of those instances that no one normally thinks there would be instances. I believe Your Honor is correct on that. I actually read that. So if that's correct, that's completely distinguishable here. She's never admitted. Certainly distinguishable. So what's your best case where we do have a really thin, debatable, triable issue? If the jury was properly, you know, instructed and it's a state-of-mind issue, usually that stays with them. They forcefully argued it. They cross-examined on it. I see all those points. But I'm wondering what your closest case is. Sure. Go ahead. I would refer, Your Honor, to the Sanjar case. That's 876F3725. That was another case in which there was both. In that case, as my opponent pointed out, it was also a health care fraud case, but kickbacks were also charged. Two important things. The Court there noted that willfulness can be inferred from intent. Excuse me. Intent and willfulness can be inferred from the profits that one makes out of the scheme. And it also had an observation that there was the thrust of the defendant's defense in that case was that he did not know about the criminal activity, but that defense was rebutted with evidence showing, including that he knew patients were being cycled between inpatient and outpatient services at regular intervals, which would not correspond to medical needs. And we think that supports our argument here on appeal, that the inherently suspicious nature of this case supports it. I would also note that the Turner case, unpublished out of this circuit, specifically refers to an instance where, in an anti-kickback case, a defendant lies to a Federal investigator about how she was paid, and that that was used as evidence to support the sufficiency of the entitlement. Not to control your argument too much, but can we talk about the false statement conviction? Sure, certainly. Are you ready to talk about that? I'm ready to talk about whatever questions the Court has for me. Well, I mean, that does concern me. I mean, that particularly the circumstances around it, that several months had elapsed before he even wrote his notes down, and that there was no corroboration. As I understand it, there was no corroboration of any kind. So we would disagree that there was no corroboration because there were reference at trial to the notes that he had. In fact, the defense, as you noted, had made a... Yeah, but, I mean, his notes were written how many months after the interview? It was unclear. It was dated, I believe, June. It was dated July, and whether it happened in January the previous, excuse me, it was either a year off because he simply got 2015 instead of 16 wrong, or that it could have been written in July of that year. So it's sort of unclear, but we can see the date was not correct, of course. Well, in other words, it was either six months or a year. Is that what you're saying? I believe that's probably accurate. So, I mean, if I had an interview with someone and tried to make notes of it six months later, after I'd done many, many investigations, I assume, because he was an investigative agent, as to what one individual told me, it seems that my memory may not be as clear as it should be to hold someone liable under criminal law for a false statement when the person is specifically denied it, and there's no essential corroboration for it. Well, Your Honor, respectfully, I would say that the law has never required there to be corroborating evidence. Well, there are some cases that have indicated that. We believe, as the district court noted, that the testimony of this agent, if the jury believed him, that that would be sufficient to convict on this charge. I know that was probably a correct statement of the law at that time, but I'm concerned about what would preclude our reaching out in this case to hold that in the Fifth Circuit false statement based on false statement convictions must be based on corroboration. Well, I think, number one, it would run contrary to the general rule that credibility determinations in sufficiency of the evidence cases have to be resolved in favor of the jury. And here they had the testimony of Special Agent Reel as well as the, you know, argument from the defense that she might not have known that, and the jury credited his testimony. I would also point the Court, as the case cited in our brief, it's from the Seventh Circuit, where the Seventh Circuit addressed very similar arguments that were being made by the defendant here, whether the questions about referring patients were too technical for her to fairly understand. And the Seventh Circuit rejected an argument that when questioned could be fundamentally ambiguous and untrustworthy, given his reliance on his notes rather than a recording of the transcript or the interview. So I think in that case, the case law supports that, as the district judge held, the testimony of this one agent could have been believed by the jury. But the notes also confirmed the statements that were said, whether the date of the notes, you know, was six months, one month. In this case, if we decided, can we hold, if we held that this conviction is overturned because we are instituting the new rule that such evidence must be corroborated before conviction can be upheld, what would be your response on rehearing? Petition for rehearing. Petition for rehearing, certainly. If I received authorization from the Office of the Solicitor General to so do so, it would be generally that that is contrary to how these court reviews sufficiency of the evidence challenges that there are. But you would say there's no procedural barrier, from your point of view, to our announcing that rule in this case and setting aside the conviction on that basis? I mean, I certainly would never tell this Court that there is anything that they are precluded from doing. But I do think it's not consistent with the law of sufficiency of the evidence and whether credibility determinations, even of one witness, are sufficient to convict. And this is the testimony of the defendant. Oh, if you're saying it's not consistent with the law, you are telling us we don't have the authority to do it. We can't. I think that is correct. I probably should have said I would never be so brazen as to tell the three of you in front of me, oh, my God, you could. The sentencing issues are very consequential for Ms. Ricard. Yes. If her objection at sentencing to the 1.9 amount is sufficient to preserve the benefit in the restitution issue. I'll just, since your time is running out, I'll tell you, Hill, which was the 28-J letter they filed, plus R. Mahmoud, make me think that it is error to not net out. So two things on that. One, Your Honor, I would disagree that the challenge was preserved. The defendant says in her reply brief that they, the calculation failed to consider value and costs associated. I would urge the Court to reread the sentencing transcript. I know I had those words, value and costs do not appear. Her argument was only the unfairness in having her tagged for more loss than her co-defendant was. And I would, and the district court specifically engaged in that discussion and said what I'm hearing is that's the only one. I mean, I have the transcript. The objection is this is not a case that they were saying, the people at Progressive that were seeking treatment didn't receive any treatment. So if they did get treatment, then Mahmoud and Hill say you've got to net it out. Respectfully, Your Honor, the fact that we didn't charge a scheme of health care fraud in this case doesn't mean that there wasn't evidence in the record to show that there may have been a lack of medical necessity. In fact, there was. Well, we said in Mahmoud you can't rebut her claim with just statements that, oh, trust us, it all should have been 1.9. I actually will refer to Mahmoud. The Court there said, by contrast, if, as in a case in Jones, which is one we cited in a brief, Medicare would not have paid for the services that Mahmoud's hospital rendered, then Mahmoud is entitled to no such credit. And, in fact, it says the services only became illegitimate sometime, if I may finish my sentence, sometime after the fact when he fraudulently billed them to Medicare. Here they were illegitimate ab initio because of the fact of which they were procured, which was by kickbacks. Well, I mean, again, I won't ask because your time is up. But that would be very hard for me to accept if Diaz's plea left him with a net out of around $300,000. This is the man who owns the company. The government continues to pay him for treatment. And now the government is saying, well, you don't need to make sure sentences cost compare. But the law is crystal clear in the commentary that we have to net. So, to be told generally, well, trust us, we really didn't mean to pay anything, even though we're letting the guy who runs the company we paid get a nonimproper benefit of $1.9 million. That's just really hard for me to reconcile. Understandably, sir, I... Yeah, go ahead. Briefly. Yes. Thank you. I would simply say two reasons why it's not plain error here. One, Landers is also clear that it's the defendant's burden to bring credit. She didn't even mention it. Had the government been aware that this was an issue or the district court, we could have come forward with such evidence, but we weren't permitted to. And secondly, the case law is not necessarily crystal clear in a case like this where the fraud, the...it was all an illegal argument to be...illegal arrangement to begin with. Namely, that's the Jones case that this Court has decided. So we'd rest on arguments and we ask that the decision be affirmed. Thank you, Your Honor. Thank you. Ms. Kuhn, you have five minutes on rebuttal, but if you need more time, we would give you additional time comparable to what we gave your opponent. I'm sorry. Thank you. Before I kind of go into my rebuttal, I just want to clarify something that Judge Jolly asked about earlier. Before you were asking about the false statements and the corroboration, I just want to clarify that I do believe that in the sufficiency context, it would be reasonable for the court to draw a line saying that corroboration is necessary in order to meet that sufficiency bar. I understood your previous question to be asking about admissibility, which is what got me a little bit confused, so I just want to clarify my position on that. But also, addressing a couple of the cases that the government brought up in their argument, I just want to draw a couple of distinctions. I know, Judge Higginson, you recognize that in Sosa, that actually involved an admission that the defendant knew the conduct was unlawful and that they were receiving illegal kickbacks or they were paying illegal kickbacks. In Sanjar, the cycling of patients, which was used as one of the elements of evidence that that would be something improper, that was a case where the defendant was a doctor and the owner of a medical facility. And so I think in these kinds of contexts, we have to focus on who the person is and what their background is. And that's what we get back to, you know, the distinctions about confidentiality training and why we require doctors and medical facilities to sign these enrollment applications and to acknowledge Medicare's rules and to agree to comply with them. The whole idea is that, you know, we do not want a situation where a doctor is taking money and then manipulating a patient's care in order to get some kind of financial benefit. And we don't want a situation where hospitals are getting patients by paying out kickbacks to doctors to get the referrals in. And in this situation, we have somebody who was neither of those parties. She was the person connecting them and acting as a marketer. And while there are connections between her and, you know, supposedly she had this connection with Joe Haines at Seaside, it doesn't change the fact that she was not the responsible party who had the authority and the ability under Medicare's rules to send patients to a facility, to send a referral, to send discharged patients and move them to another facility. And so I just kind of want to point that out and make that very clear. The government's argument for sufficiency here really boils down to, you know, the fact that this is, quote, so overwhelmingly suspicious. And if that's the bar that we're going to create, then that basically just eviscerates the knowledge and intent requirement entirely. If we're going to say that any time there is payments involved in some kind of marketing effort when it relates to Medicare patients or health care patients generally, that completely lowers the bar from what Congress intended. Congress added this requirement in 2010, and they specifically did so because they wanted to make sure they were not punishing people who, while they act perhaps improperly, acted inadvertently. The jury is told they had to find specific intent to do what the law forbids. Right. I'm sorry, is that a question? Well, therefore, the jury heard all these really tight arguments about did she know or didn't she? Right. And, again, you know, back to the... Was I right when I asked did the jury send out a question about willfulness, or are you not sure? I believe I recall seeing a jury question in the record. I just don't recall the specifics of what it was. On the sentencing points, do you want to speak to those? Yes. With regard to the sentencing issues, you know, I would just reiterate the points I raised before. You know, as Judge Higginson, you recognized Milton Diaz, he had to sign a plea agreement, and he is subject to $249,000 of restitution, and that's how his guidelines were calculated. And now we have the person who has no financial interest in Progressive, has no ownership interest, who gets slammed with $2 million after the fact, after she decides to fight her charges at trial. And I think that's, you know, aside from the legal arguments, which I feel like I've argued at length, that just, you know, there's something that's patently unfair about that. And I believe that when it comes to restitution, obviously, that is only intended to provide compensation and make a victim whole when they have somehow been hurt by the conduct of the defendant. And here there is no evidence of that. And, in fact, Medicare's conduct in refusing to stop paying Progressive money, even at the government's request, which was in Agent Real's testimony, I mean, that shows clearly that they don't believe themselves to be victims that suffered any kind of loss. And then when it comes to the guidelines, again, it's like you said, you know, the fact that her guidelines get increased, I believe that the guideline range got increased by about two years because of this heightened enhancement that she was subjected to. How did the non-failure of taxes come in as evidence in this case? They used that as evidence of her knowledge that she was engaging. There was no objection to that as 404B beyond? Is that part of the 404B objection? I don't believe that there was any actual objection to the introduction of the tax returns. But, you know, I mean, basically the evidence boils down to that and the false statement, which, you know, as we've explained, that was two years after the fact. There was no corroboration, as Judge Jolly noted. There was also this, you know, unclear time window. I'm sorry? Your time has expired, but if you need some more time to address the restitution argument, we'll put two minutes on the clock to give you time to address the restitution issue. Okay. Thank you. Regarding the restitution, I mean, I feel like the whole point is that it has to be actual losses. And the courts have said, this Court has said, that when you impose a restitution order that is above the amount that's the actual loss to a victim, that is a violation of the statute, and that exceeds the statutory maximum. And so I think this is a clear case where that occurred, and so even under a plain error view standard it would be. If you prevail on the improper benefit argument, is the relief that you would request the same as to restitution, that it has to go back, vacate, remand, the district court will do an assessment as to was there, beyond the bribe, some benefit? Yes? I would. And does that apply to restitution as well? I believe that the restitution, the court can make the determination that there's no evidence of actual loss in the record and vacate it entirely. With respect to improper benefit, I think there is a basis to say that that enhancement should be removed entirely, and that it should be vacated and remanded with instructions to remove the enhancement, because I think it was, as I said, it was the government's burden to provide evidence of that. I think as a second alternative, it would be a remand to the district court to do the proper calculation and hold the government to its burden of presenting evidence to do that net value calculation. And if there are any more questions, I'm happy to answer them. Otherwise, thank you.